14 2478 Todd Michael v. City of Troy Police Department at all. Oral argument not to exceed 15 minutes per side. Mr. Cioffi for the plaintiff appellant. My name is Sean Cioffi. I represent the appellant Todd Michael in this case. This case is comes to us with relatively narrow issues. Comes out of summary judgment and we have an ADA claim where my client was constructively discharged as a police officer for the city of Troy after a surgery for a craniotomy for a benign mass in his brain. Now this case has a long history going back many years but through the opinion of the district court it's been essentially narrowed down to what I see as two issues before this court. The first issue is whether or not there was a failure to accommodate my client. The second issue is whether or not he was qualified to be a police officer. Now there's two cases. When you say that do you mean the police officer who works dispatch or do you mean out in the field? Wonderful question. And it's a good question because when we took depositions and looked into this issue we found that a lot of those positions are no longer filled by sworn police officers. They're filled by civilians and outside standard employees. But the curious feature of this case is that on March 17, 2009, as cited in our brief and in the underlying court, Mr. Michael was assigned to the office of the chief of police, which is a preliminary measure in a disciplinary action. There was a question about whether or not he had wrongful... That's something that's known in the department? That's not something known to... that wouldn't be known to us? That that's a it's explained in the letter that essentially it says in the letter that he shall turn in any department weapons, identification keys, but most importantly you shall take no police action whatsoever until further notice. This was his status on March 17, 2009. Six days later he notifies the city that he's going to need another surgery. Now his status then means that it was at the time that all this was material was more akin to being in dispatch, to directly answer your question. His status... Where does the disciplinary aspect come in? Didn't you say that when one is assigned to the chiefs, right, it's it's it struck me that you were tipping us that this is a discipline, pre-discipline. It's it's it's it's actually during the investigation prelude to a discipline. There hasn't been a decision yet whether or not... So there was some conduct that prompted his being assigned to the chiefs. Right. And the conduct now, what do you say about that conduct? What was it? Is that irrelevant at this point? The allegation was that he was associating with a known felon. All right, but that's not your point. Your point is this is his status. Right, his status at the time, what he was doing as a police officer for the city of Troy was simply calling in four days a week to see what his status was. He had no weapon, he had no badge, he had no weapon. The police testifies that they might use for disciplinary actions, they might use it for an officer who was involved in a violent episode like a shooting, they might use it for an officer who was who was having some stress-related issues. It was a general catch-all holding pen. Now here's the thing. While he was in that position, he was had full pay and full benefits. It was only almost a year later in January after they sent him for his examinations by Dr. Van Horn that they then moved him to what they called unpaid administrative leave. Now that's important because that's a constructive firing. It's a constructive firing as evidenced by pleadings filed by the city attorney in state court in a parallel case brought by the union where the city attorney admits in a pleading that Todd Michael was not an employee. When we asked Todd Michael's employment status, he couldn't tell us. He searched for the words and he couldn't say whether or not he was an employee or not. That's a constructive fire. Let me ask you this. Your disability claim is a regarded as claim. Your position is your man in fact is not disabled, he's able to be a police officer, but the department regarded him as disabled because of these, well, three craniotomies, but the last one in particular. Is that correct? Well, just a little, just for candor towards the tribunal, we're almost six years later now. At this point, Mr. Michael could not be a police officer. I will be candid to the tribunal, but back then in 2009, 2010, 2011, 2012, he could have been a police officer. That was the position up until we filed suit. Okay, now your position is, I gather the district court said that despite the fact there was the judge didn't take into account, what is it, Lytham, is that the? Lytham, yes. Lytham, Daniel, Benincasa, those three said your man could return, but he said, but yeah, but they didn't do individualized inquiries, so we're going to disregard those opinions. Is there any problem with that? I think so. I think the judge was weighing credibility of the doctors. She was engaged in an analysis that was more proper for the jury. Under the district court's analysis, under Judge Levy's analysis, essentially, if the city has an individualized inquiry from a physician, that's all they need to rely upon. They don't need to rely upon anything else. The city itself doesn't need to do an individualized inquiry about the continued employment of the appellant. By way of example, on the same diagnosis... Individualized inquiry is always medical? I mean, you're not speaking, it's always a physician? I don't know if it's always a physician, but in this case... I guess it could be a vocational expert, something like that. I would think so, yeah. But in our case, we're talking... In our case and in the case that is cited by the district court, the Wurzel case, these were medical opinions. These were physicians. They were family physicians. They were IME physicians. It was very similar setup of the physicians on either side. But back in 2000, 2001, when my client was first diagnosed with this ailment, he had the same or similar treatment, same or similar symptoms, and returned to work in 2001 on a simple doctor's note, without an individualized inquiry by any physician from the city, and was hailed as an inspiration upon his return. But there were a number of things that happened between then and now. I want to ask you some questions about the statute and sort of the statutory question that we're answering in this case. But since you bring up that factual aspect of the case, at the time they put him on administrative leave, they have not only some doctor's opinions, Van Horn, etc., regarding whether he has the ability to have the executive functioning to do the functions of his job. And I don't... When I go through this, I do not mean to attack your client's character. I understand where you're going. Please, go ahead. But they have to make a decision about whether to put a gun in your client's hand again. Yes. And in addition to the report, the medical opinions, by this time, by the time of the third surgery and after, I mean, you're aware that they get a report that he's accompanying a drug dealer to drug transactions for reasons that are really murky. We have this cattails incident. They don't know if that really happened, but they do have Jamie, I guess, his wife at the time, I think, tell them that he told her that he cut these cattails off in an attempt to intimidate his wife. We have this recording of the chief craft, and then we have this episode where he serves the chief with a summons at the chief's retirement party. So, I mean, one could, I think, quite reasonably say this is bizarre behavior. And it's perhaps behavior that is consistent with somebody whose executive kind of frontal lobe functioning is impaired by a brain condition. And isn't that something, in addition to the opinions, the medical opinions, that we have to somehow take into account when we make a decision about whether there's a genuine issue that the Employer Act acted based on stereotypes about people who have brain tumors or on the basis of a decision that this person is not able to carry a weapon. You know, I think, but Chief Mayer had already made the decision to terminate my client before he was even a chief, back when he was a captain. In 1995, he issued a memo indicating that we need to terminate Mr. Michael. He had already made that decision a decade and a half before, and it was only when he became the chief of police that now he was a hammer and everything looked like a nail to him. Well, I mean, you know, if he decided, if there was something that said, let's say he had a brain problem at that time, and, you know, I just don't like being around people that have brain tumors, and he had written that down. Maybe that's direct evidence of discrimination, but if they just had some bad blood, that's not actionable. Directly answer your question about those enumerated allegations. I mean, aren't they germane to the legitimacy of the decision? I don't think so. Okay. I don't think so, because, for example, number one, serving somebody with a lawsuit, Mr. Michael didn't do that. A process server did that. They may make some arguments about, like, the timing and the direction that he was doing it as an agent, but I'm engaged in civil litigation. I'm allowed to serve people. Okay. All right. It might not be the best judgment. Give me that. What about the others? The associating with the felon, that was never substantiated. He had been placed on this administrative holding position, the office of the chief of police, while that was investigated. Right. He had been previously investigated and was exonerated on other issues. You know, I would hate to be subject to just allegations like that and be disciplined as a result or have that count against me. Then the cattail, the issues about these alleged steroid vials, all that kind of stuff. When we deposed Chief Mayer, we were able to... I think it's in the testimony that every other allegation is traced back to an ex-wife. And I would hate for the ex-wife to be the gatekeeper of one's continued employment. That just doesn't seem to be a fair standard. Certainly, Mr. Michael might be a colorful individual. And I actually see it as problematic that the chief or the city would utilize not only the report of Van Horn, but then 20 years of personal opinion, observations, rumors, statements from ex-wives. A lot of this was right before the third brain surgery. A lot of it was before. So a lot of it was before. So I think one could argue that, well, I can look at that in conjunction with Van Horn's opinions, and I can use that as evidence as well. But that's not what the statute says. The statute says they're able to rely upon the individualized inquiry. That's a reg, right? What's that? That's a reg you're referring to? Well, it's the Wurzel opinion is how it was stated here. But they're relying upon more than that. They're relying upon their own layman opinion about an ex-wife talking about cattails in a box. Well, let me ask you about the statute, if I may, real quick. Sure. I kind of want to just go back to, well, what is the statutory question we're trying to answer in this case? Yes. And so the statute bars employers from, quote, discriminating or discriminate against a qualified individual on the basis of disability. Right. Is it fair to say the question in this case is whether he was placed on unpaid leave because on the one hand or as one possibility because of stereotypes about brain surgery or people with brain tumors on the one hand which is actionable, or on the other hand because they thought, correctly or not, that he was not able to do the functions of his job? Right. Is that fair? Yes. Okay. Yeah. And that, I think, is what it comes down to is, as the district court noted, the issue is whether or not the city was required to provide a reasonable accommodation. They suggest that because he said he wasn't disabled, and the case law supports this, that he wasn't disabled, that the city doesn't have to give him a reasonable accommodation. But the workman opinion upon which the city relies is different. In the workman case, the employee was fired. And the workman case clearly states that in such a situation, that could be actionable if found by the jury. So in our position, if Todd had come back, if Mr. Michael had come back- You need to wrap up, counsel. Oh, sorry, Your Honor. You can wrap up. Finish that sentence, please. If he had been returned after making the request, he would have been returned to the office of the chief of police, which required none of those essential policing functions, and that investigation would have completed. But we never had that happen. Thank you, Your Honor. Thank you. Mr. Lange. May it please the Court, Craig Lange, appearing on behalf of the city of Troy in this matter. Your Honor, to answer your question that you asked, this cannot be put on the process server in terms of serving Judge Kraft, that is, retirement party. In the lower court record 30, document 2, page 593 in his deposition, I asked these questions and obtained these answers from Plaintiff Todd Michael. Question. Did you direct that you wanted the chief served on March 13, 2009? Answer. Yes. Question. And did you know in directing that the chief be served on March 13, 2009, that that was the date and time of his retirement party? Answer. Yes. Question. And did you specifically intend to have the chief served during that retirement party? Answer. Yes. Question. And you believe that your intention to serve a man who you called a friend, the man who you indicated was your Christian brother, is it your opinion that your firm intention to have him served at this retirement party was an exercise of good judgment? Answer. Yes. And in terms of the comments concerning his ex-wife, I ask in the same deposition, I ask the question, he tape recorded his wife at a marriage counseling session, no less. I said, question, do you think that secretly tape recording your wife at a marriage counseling session is an exercise of good judgment? He said, answer, extreme. Question. Do you think that seeking to have your wife charged with perjury, the mother of your children, was an exercise of good judgment? Answer. Yes. So the things to which you speak were extrinsic evidence of the behavior of Todd Michael that was impacted by three craniotomies. The last one in this record, March 2009. Well, that's the question. You've got some doctors that say, yeah, it was affected by the craniotomy, and several who say, no, it wasn't. I'd like to speak to that, if I may, Your Honor. I think that the test is whether or not the city of Troy relied on reasonable medical judgment. I think that's what Wurzel teaches us in other cases of this circuit. In getting to that, we have to look at whether there was individualized inquiries made by these neuropsychologists. As it relates to neuropsychologist Van Horn and Dr. Seawig, there's three parts to this individualized inquiry as I see it in Holliday v. Chattanooga. Number one, you have to do a medical assessment. Number two, you have to know and analyze what are the job responsibilities, what are the duties, the descriptors of what this person does. And third, you have to then apply the medical condition to the job duty and decide whether or not it's going to adversely impact the performance of those duties. Dr. Van Horn, Dr. Seawig, and his own neuropsychologist, Dr. Bilyaskis from the University of Michigan, all did that. They concluded that based upon the neuropsychological evaluations that they conducted, objective neuropsychological evaluations, they had discussions with Todd Michael, they interviewed him, all three of them. And then they had the job descriptions for a Troy police officer. And when you review all three of their reports that are in the record, you will see that they analyzed exactly what an individual inquiry is supposed to be. Well, and, I mean, we are familiar with that because it's such an important part of the case. But this case, I mean, let's set aside the Wurzel case for whatever reason it wasn't published. This case is perhaps the first one that where, on the one hand, the employer does have medical opinions that they've got to be individualized. I mean, seven hours of in-person interview with the plaintiff. So they have that on the one hand. But on the other hand, Mr. Trophy and others would say there are actually individualized opinions on the other side. And we don't really have a case where it's not just on the side of the employer. So this is a different situation. And so I think the question is, well, why doesn't that create a genuine issue? So here are my two questions, all right? Do them any time you want. Why doesn't that create a genuine issue of material fact? And number two, as I asked Mr. Trophy, I mean, a genuine issue of material fact as to what exactly? What exactly is the question, the statutory question that this evidence is supposed to be answering? I think to answer your second question first, it's whether he's otherwise qualified. And I just should note for the record that I believe that the Sixth Circuit has changed the prima facie case. It's not cited in our briefs, the Demyanovich versus Caden plating. It's now a three-part test. But both the prior test that was applied by this court and the current test all, as the second factor, require that the employee be otherwise qualified or the plaintiff be otherwise qualified for the position. And that's really what we're dealing with. Included in the otherwise qualified inquiry, and Judge Kethley is trying to get to the question, what's the timing for that? Counsel's telling us that otherwise qualified ought to be judged from the short period of time where he was assigned to the chief to here. So is the question, should we refine it to that? No. No. Why not? That's a red herring. Okay. In essence, he was assigned. In labor law, we call that a... What is the time? Let's say that you say that's not right. As a functioning police officer for the city of Troy. His assignment there was simply because he was being investigated, thank you, for misconduct, serious misconduct, for which he had been previously disciplined at some point. That is a temporary status. It's only to remove someone. Will you return then to Judge Kethley's questions?  Will you return to Judge Kethley's questions? Yes. So the issue is, from our perspective, otherwise qualified, does he pose a risk, a direct threat of harm to self or others in his position? That is the test. And so let me return back to the doctors. Whether objectively there's reason to think he posed a risk or not, or is it a subjective question about what your client, the city, thought? It's kind of like an honest belief question. I believe it's an honest belief question, Your Honor. And I do believe that this court recently in Crowell versus, I think it's White Lake Township, recognized that in these public safety positions, we have to be extremely careful where there's tremendous risk of harm to the citizenry if we take someone who has psychological problems and put them in the workplace. And I think the question that has to be looked at is, did the city have a reasonable basis to rely on these neuropsychological reports? And let me address, I always call him Dr. Lethan. I don't know if it's Lythan or Lethan, but here's the point. The lower court said that was not an individualized inquiry. The lower court may have been wrong. I don't think so, and let me say why. Number one, I think the lower court hit it right on the head on that, Your Honor. And the reason they hit it on the head is because on that three-part analysis, Dr. Lethan spent a lot of time talking about the medical assessment and the medical evaluation, but spent no time, none, on the job description and the job duties. You will find the word job duties in his report, only to this extent. He says that he can perform his job duties. Every other neuropsychologist, Dr. Sewick, Dr. Van Horn, Dr. Bilyaskis, talked at length about the job duties and responsibilities of a Troy police officer and about police officers generally. You will not find that in Dr. Lethan's report anywhere. And I will also say to you there are at least two places in his report where he indicates that he was below expected levels of performance. In problem solving and in judgment, and yet he never tied anything back. So he missed it when it come to assessing the job duties of a police officer. And furthermore, in his deposition, he indicated, Your Honor, that he didn't regularly examine police officers, and he admitted he did not look at any job description. You know, what strikes me as odd, though, aside from that, Mr. Michael, the officer, was suspended due to Van Horn's report, right? That's when the city put him on unpaid leave. That's right. All right. Then, though, here we have the two doctors you refer to, Van Horn and Sewick. Is that the way it's pronounced? Sewick. And they were both in favor of the city saying that he can't return to work. Then we have Dr. Daniel and Dr. Benincasa, who were evaluating for the long-term disability plan the city has with standard insurance, and they both say, Oh, he's fine. He can return to work. So it's like a catch-22. And I can address those two. At that time, Todd Michael was telling those standards there was nothing wrong with them. And this is for long-term disability. These people, I'm not saying they didn't look at it through some objectivity, but, in essence, the other reason that they fail as individual inquiries, as addressed by the lower court, the other reason they fail is they did not talk to Todd Michael. They did not interview Todd Michael. They are based solely on a third-party assessment. They relied on Dr. Lethan, which I guess I don't blame them because they were able to say, I don't think you should get long-term disability. But they did not engage in individual inquiries either. All right. Is there any case you can cite me that says that by not interviewing or examining him, that that means they have not done an individualized inquiry? Yes, there is. I can. Give me just a second to see if I can track it down. When I got up this morning, there was none. I can understand that. There is an unreported decision, but Judge Levy cites it in a fed sub-case recently and indicates that, yes, you cannot rely on third-party assessments. And the point of it is... Please give us the cite after Mr. Kofi, if you'd stand up so you can proceed. Thank you. I'll find that for you. And so the other thing that I think is very interesting is that Dr. Lethan said this. He said, Dr. Van Horn's testing was conventional, but he says he used different methodology. And here's what he said in his deposition. He said, I'll tell you, I believe activities of daily living, ADLs, trump the neuropsychological testing. So then I asked him about several of those things that we discussed a little earlier, about him tape recording Chief Kraft, about tape recording his wife, all of those things. I asked him, I said, were you aware of these things? He said, no. That's in the record. And I said this. I said, had you known about those things, might that have changed your conclusion in terms of ADLs, activities of daily living? He said, yes. And the point of it is, if he was going to rely on activities of daily living, he shouldn't have relied solely on asking Todd Michael, hey, how are things going on a day-by-day basis? Fine. Okay, thanks. What's that? Which doctor is it that gave this testimony? That is Dr. Lethan, the one who is on the other side of the only one, and who Judge Levy said did not come up with an individualized inquiry. You know, what bothers me a little bit is, if in fact we determine that the district judge erred in what is an individualized inquiry or not, and therefore she should have taken into account the three doctors that testified favorably to Mr. Michael, would we have to remand it for reconsideration in light of looking at all these doctors' opinions rather than only the ones that were favorable to the city? Well, I think she did look at all of the opinions and determine that three were not individualized inquiries. But I will say this, ultimately she did also say this, and I believe this is true. In this setting, with a law enforcement officer and whether we're going to put a gun in his hands, this is not a matter that should go to the jury. And I think that Diaz v. City of Philadelphia, which is cited in our brief, and other cases stand for this firm proposition that we cannot be taking public safety officers and putting the risk of harm to the public and leaving that up to chance. We have to be able to rely on reasonable medical judgment. Well, let's just say as a hypothetical. Let's say Van Horn had given an opinion that he's not qualified to return, and then there were five other doctors who said Van Horn's all wet and he can return. Now, are you saying that that would still be a reasonable judgment by the city just to go solely on Van Horn? Judge, we have in the collective bargaining agreement between the city and the Detroit Police Officers Association a process, which is what we followed. But the law, what answer would the law give to Judge Gilman's hypothetical? The law would permit the city, we had the need for two. The ADA. The ADA would say we have a right to rely on reasonable medical judgment. Would it be reasonable, I guess, is my question. If you had one doctor who said, say you had a ringer who always said he's not qualified, and then no matter how many doctors the officer put on, you could still disregard all those others? I think the issue is going to have to be whether or not we're making decisions based on stereotypes or whether we're relying on an individualized inquiry. And I think that's what we did here. We relied on Van Horn, Seawick, and we even have Belyaskis, who he was sent to by Dr. Lethan, who says he'll give you a fair assessment. He also said, based on what's required of a police officer, I cannot put you in, I cannot recommend you in. That's the sort of wish he was, because he ended up saying, well, if he's tested for gun shooting and other things, he may be okay. That was never provided to us ever until through, that was never given to the city. But in any event, we're not, and even that. I think we have your points. If you could wrap up, please. Thank you, Judge. I will wrap up and say thank you, and I'll find that site for you in the next couple of minutes. That'll be fine. Thank you very much for your time. Thank you for your argument. Mr. Kofi, it's your turn. I'll be brief, Your Honors. I think Judge Gilman Everybody says that. Yeah, we're not buying that. We've heard that before. I think, Judge Gilman, I think you hit it on the head. If you've got one opinion that says he's not qualified and five that say he is, Judge Levy's opinion strips any rights of a police officer under the ADA. The Pelley's in their brief say that if there's an individualized inquiry, the decision should not be second-guessed. That strips any rights under the ADA from a police officer just by virtue of him being a police officer. And it isn't left to haphazard chance that he would continue his employment. Let me ask you this question, all right? Again, if the question is whether the employer acted on the basis of stereotypes or whether the employer acted based on a belief that the person couldn't do their job function, all right? Let's say, hypothetically, we had a case where it's basically undisputed that on the one hand, the employer subjectively acted because they thought the person could not do the job functions. But on the other hand, there is a genuine issue as to whether they actually could do those functions. Is there liability or not under the ADA? I think so. Why? To go back to because that's the stereotypes that we're talking about. Well, but if the employer undisputedly didn't act because of the stereotypes, but doctors could argue about whether the person was qualified, why is it? The employer is only going on a report from a physician. I mean, just forget the details. It just shakes out to the employer. It's undisputed. The employer acted based on a good faith belief and not on stereotypes. Can they still be liable? According to Judge Levy's opinion. I don't care about that right now. What I care about is your answer. Yes. I think there would still be liability. I think there still has to be a mechanism for the employee to challenge that reasonable basis. This is a summary judgment question. The question here is whether or not we get to take it to a jury. Employees. Would it not be true that the employee's interest in this is just to hang their hat appropriately on the law that says thou shalt not act on stereotypes about disabilities or folks with disabilities? Sorry, I didn't understand. Me neither. I'm just kidding. No, but isn't that the point? That's all an employee has on their side of the ledger is that you're acting on a stereotype. Yes, that's all he can say is that the reliance upon a report wasn't reasonable and that you must have been acting on stereotypes. And that's brought out by the testimony of Chief Mayer, who testifies that he also considered the cattails and everything else, which he didn't say this, but the implication would be, well, that's what a crazy person does. That's what an unsafe person does. He's not a physician. He's not qualified to make that assessment. And I think I'm out of time. Thank you. Your argument is both very well done. You've aided the court. It's an interesting case, so we will consider it carefully, issue an opinion in due course. Thank you. Yes, please. I was referencing the case of Jones v. Nyssen in a 438 FEDAD 388-401 cited by Judge Levy in a case called Anderson v. GM 45 F sub 3662. It's a 2014 case. All these are unpublished cases. Well, that's a lower court case. Oh, that's a district court case. Well, we don't pay any attention to district. No. Thank you.